IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 18, 2019

## HENRY EPPS v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Montgomery County**
**No. 41200478       William R. Goodman, III, Judge**

_____

## No. M2018-01772-CCA-R3-PC

_____

Henry Epps, Petitioner, entered a best interest plea to six counts of sexual exploitation of a minor; the remaining nine counts of sexual exploitation of a minor were dismissed per the negotiated plea agreement.  Petitioner received an effective sentence of eight years with release eligibility after service of 100% of the sentence in the Tennessee Department of Correction.  Petitioner filed an original and an amended petition for post-conviction relief.  After an evidentiary hearing, the post-conviction court denied relief.  Petitioner filed a timely notice of appeal.  This court reversed and remanded for a new post-conviction hearing and for entry of an order that contained specific findings of fact and conclusions of law relating to all issues raised.  At the second post-conviction hearing, the post-conviction court admitted numerous affidavits and reports from Petitioner's forensic expert and the State's forensic expert.  The post-conviction court then denied relief in an order.  On appeal, Petitioner alleges that trial counsel's performance was deficient because he "failed to consult with or inform [Petitioner] as to whether [Petitioner]'s expert would be used at trial" and "unilaterally discarded [Petitioner]'s defense, allowing him no say as to whether the case would proceed to a trial that would have presumably consisted of a jury hearing testimony from each side's competing experts."  Petitioner asserts that he would have proceeded to trial absent trial counsel's deficient performance.  He also contends that he did not knowingly and voluntarily plead guilty because he "did not have a meaningful opportunity to confer with trial counsel about alternatives[,]" that "trial counsel . . . unilaterally deprived [Petitioner] of the option to choose trial[,]" and that Petitioner "had no prior experience with criminal proceedings, which would have weighed in favor of a finding that [Petitioner]'s plea was not voluntary, intelligent, or knowing."  After a thorough review of the facts and applicable case law, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and D. KELLY THOMAS, JR., J., joined.

B. Nathan Hunt and Zachary L. Talbot, Clarksville, Tennessee, for the appellant, Henry Epps.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; John W. Carney, District Attorney General; and Daniel Brollier, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I. Factual and Procedural Background

*Guilty Plea Submission*

Petitioner was indicted on May 7, 2012, by the Montgomery County Grand Jury for fifteen counts of sexual exploitation of a minor. On August 18, 2014, Petitioner entered a best interest guilty plea.[1] The trial court explained to Petitioner the elements of the offense he was charged with and the sentencing range of that offense. Petitioner affirmed that he understood the charges against him and the possible sentencing range. Petitioner affirmed that he understood that, by entering a best interest plea, the trial court would enter a judgment of guilty but that it would not ask Petitioner whether he was guilty of the offenses. The trial court informed Petitioner that he had a right to a jury trial and to plead not guilty, that the State would have to prove the elements of the charged offenses beyond a reasonable doubt, that Petitioner had the right to confront the State's witnesses and the right to present his own witnesses, that he had the right to remain silent at trial or to testify in his own defense, and that he had the right to appeal if he was convicted by a jury. Petitioner stated that he understood that he was waiving these rights by entering his best interest plea. Petitioner affirmed that it was his desire to enter the best interest plea.

The trial court then accepted Petitioner's best interest plea to six counts of sexual exploitation of a minor and noted that, at a later hearing, the trial court would dismiss the remaining counts from the indictment and enter a formal finding of guilt. On January 7, 2015, the trial court sentenced Petitioner to an effective sentence of eight years with

---

[1] The State's recitation of facts in support of the guilty plea was set out in this court's first opinion relating to Petitioner's case, and we will not repeat it for purposes of conciseness. *See Henry Epps v. State*, No. M2016-00626-CCA-R3-PC, 2017 WL 1830097, at *1 (Tenn. Crim. App. May 4, 2017), *pet. to rehear denied* (Tenn. Crim. App. May 22, 2017), *no perm. app. filed*.

release eligibility after service of 100% of the sentence in the Tennessee Department of Correction.

On July 29, 2015, Petitioner filed a timely pro-se petition for post-conviction relief. Counsel was appointed, and on January 29, 2016, an amended petition for post-conviction relief was filed alleging that Petitioner received ineffective assistance of counsel. Petitioner also filed a motion requesting that the post-conviction court "authorize funds in the amount of Three Thousand Dollars ($3,000.00) to be used to hire the services of Tami L. Loehrs to testify at the hearing scheduled in the above referenced matter on March 14, 2016 or in the alternative to allow Ms. Loehrs to participate by telephone at said hearing."

*Post-Conviction Proceedings*

At a hearing conducted March 14, 2016, Petitioner testified that he entered a best interest plea to six counts of sexual exploitation of a minor, and he was sentenced to an effective sentence of eight years. Petitioner explained that he retained Ms. Loehrs as a computer forensics expert and that he paid her $20,000 for her services. He stated that, before his trial date, he believed that Ms. Loehrs was prepared to travel to Tennessee and testify on his behalf at his trial, which was scheduled for August 18, 2014. On Friday, August 15, Petitioner "had a meeting with [trial counsel], and after the meeting – [he] was under the impression that [Ms. Loehrs] was going to be there." Petitioner contacted Ms. Loehrs that afternoon "to see how much money she need[ed] as far as flying back here to testify. [Ms. Loehrs] said [that] she [was] not coming because she wasn't put on the witness list by [trial counsel]." After learning that Ms. Loehrs would not be testifying at his trial, Petitioner contacted trial counsel. Petitioner testified that trial counsel told him that he did not have a defense and that he had three options: "take a plea deal;" "flee to Mexico;" or "hire a new attorney." After speaking with trial counsel, Petitioner wrote a letter to trial counsel terminating his representation and a letter to the trial court, informing the court that he had ended trial counsel's representation and requesting a continuance. Petitioner also spoke with other attorneys about hiring new trial counsel, but he was unable to retain a new attorney.

On Monday, August 18, 2014, Petitioner attempted to deliver the letter to the trial court, but he was informed by the court officer that the letter would need to be mailed to the trial court. Petitioner then gave both letters to trial counsel, and trial counsel informed Petitioner that he would submit the letters to the trial court. After trial counsel had a conference with the trial judge and the assistant district attorney, trial counsel advised Petitioner that the trial court denied the continuance. Petitioner stated that trial counsel did not indicate that he was prepared to try Petitioner's case and instead advised Petitioner to accept the State's plea offer—that Petitioner enter a best interest plea to six

- 3 -

counts of sexual exploitation of a minor, the remaining counts would be dismissed, and Petitioner would be sentenced to eight years at 100% on each count to be served concurrently. Petitioner testified that he felt like he had no other choice but to enter a best interest plea because his expert had not been subpoenaed to testify, his request for a continuance had been denied, and his "attorney wasn't going to fight on [his] behalf." He explained that Ms. Loehrs' report and testimony would have been beneficial to his defense if he had proceeded to trial and that he would not have entered a best interest plea if Ms. Loehrs had been subpoenaed to testify.

On cross-examination, Petitioner agreed that he had entered a negotiated best interest plea and that, if he had proceeded to trial, he would have faced a possible sentence of over seventy-two years. Petitioner also agreed that, prior to trial, trial counsel had informed him that the State's expert had reviewed Ms. Loehrs' report and prepared a report to rebut Ms. Loehrs' conclusions.

Trial counsel testified that he was retained to represent Petitioner on the current criminal charges. When asked if he recalled advising Petitioner that his only options were to plead guilty, flee to Mexico, or hire a new attorney, trial counsel responded that he did not recall, but the statement sounded like something he would have said. Trial counsel explained that Petitioner also had the option of proceeding to trial, but he stated that Petitioner did not have a defense. Trial counsel stated that Ms. Loehrs had traveled to Tennessee and "looked at the computer software and made a report." Trial counsel shared that report with the State. The State shared Ms. Loehrs' report with its expert, who then examined "the computer a lot more thoroughly than he had done the first time." Consequently, Petitioner's case was continued for several months while the State's expert examined the evidence. Trial counsel stated that the State's expert then "issued a report, which . . . seemed to be a much more thorough and accurate assessment of what was in the computers as opposed to Ms. Loehrs' evaluation." Trial counsel explained that the report prepared by the State's expert "pointed out a lot of things that Ms. Loehrs . . . didn't look at, and [that Ms. Loehrs] made some assumptions that were incorrect[] and used . . . some kind of software to examine the hardware that was out-of-date or not the correct software to use."

Trial counsel explained that, after Ms. Loehrs received a copy of the State's report, she traveled to Tennessee a second time. Trial counsel stated that Ms. Loehrs informed him of the following during a telephone conversation:

> [A]fter [she] evaluated the computer software, after the State gave the very exhaustive report that they gave, she could not contend and she could not argue against the State's report, and essentially told [trial counsel] that the State's report was correct; that there was child pornography on the

computers, and [Petitioner] was the one who had access to it and [Petitioner] was the one that was looking at it.

Trial counsel asked Ms. Loehrs to put her findings from her second examination into a report because Petitioner had disagreed with her conclusions and asserted that several of the counts in the indictment were based on time periods "where [Petitioner] would not have had access to these computers when these images were allegedly downloaded." Trial counsel explained that he did not subpoena Ms. Loehrs to testify at Petitioner's trial because she had informed him that she could not argue against the State's report. When asked when he notified Petitioner that his expert had not been subpoenaed or indicated as a witness on the witness list, trial counsel stated "[p]robably right after [Ms. Loehrs] told [him] on the phone that she could not dispute the State's follow-up report."

Trial counsel stated that he did not recall that Ms. Loehrs had informed him that "she could still identify four or five images that [Petitioner] would not have had the ability to download because he was somewhere where he would not have been able to do that[.]" He agreed that he was concerned about representing Petitioner at a jury trial because Petitioner did not have a defense. Trial counsel could not recall specifically what he discussed with Petitioner before the plea submission hearing but stated that Petitioner "wasn't happy with what he was hearing[.]"

On cross-examination, trial counsel testified that, on the morning of the trial date, he knew that Petitioner wanted to terminate the representation, and he informed the trial court during the meeting in chambers that Petitioner wanted to terminate the representation. Trial counsel agreed that Petitioner's trial was continued on at least one occasion to allow Petitioner to leave the Army before entering a plea. Trial counsel also agreed that, after reading the experts' reports, Petitioner's best strategy was to negotiate a plea offer with the State; however, trial counsel stated that he was prepared to proceed to trial if Petitioner had declined to enter a best interest plea.

On redirect-examination, trial counsel stated that Petitioner "was very consistent all along that he didn't do anything." He stated that Petitioner had "receipts" that allegedly showed that he was "at locations where he couldn't have retrieved or downloaded some of the[] pictures or images that were allegedly downloaded." Trial counsel gave the following explanation concerning the importance of Petitioner's "receipts":

> When child pornography was being downloaded on the computer, apparently somebody was on the computer entering [Petitioner's] passwords to check his account at Fort Campbell Federal Credit Union and checking other accounts that were in his name only, which presumably is

what led the State's expert to believe that it was [Petitioner] who was downloading the child pornography and then checking bank accounts and other things while it was occurring.

Trial counsel agreed that Petitioner had an eighteen-year-old stepson who was also living in the house at the time the offenses were committed.

On recross-examination, trial counsel agreed that two computers and one external hard drive were involved in the commission of the offenses and that Ms. Loehrs did not examine one of the items. Trial counsel was asked about Petitioner's assertion "that he was on vacation somewhere when some of the downloads were done[.]" Trial counsel stated that "the State's expert actually reviewed where the login entries were, to show [where Petitioner] was at the time that he said he was gone." Trial counsel agreed that the State's expert's conclusion that Petitioner had downloaded the images of child pornography was based on the fact that some of the images were downloaded on the computer while Petitioner was overseas and had taken the computer with him and on the fact that the expert could prove that Petitioner had custody of the computer at the Atlanta airport at the time some images had been downloaded. Trial counsel agreed that it was his opinion that it was in Petitioner's best interest to enter a negotiated plea. Trial counsel noted that the State had initially offered a plea offer of an eleven-year sentence but that Petitioner entered a best interest plea to an eight-year sentence.

After trial counsel's testimony ended, post-conviction counsel noted that Petitioner had filed a motion "to have [his] expert either appear or participate telephonically." Concerning the reports of the two experts, post-conviction counsel stated: "We would stipulate that the reports [were] prepared, that we're going [to] pass up, were from our experts. So the Court could take that under advisement and review it." Post-conviction counsel continued: "So I spoke with [the assistant district attorney general] and [Petitioner]; my client doesn't have an issue with just presenting the expert reports of each respective expert and letting the Court take that under advisement to review it, Your Honor." The trial court then asked the State if it was willing to stipulate to the introduction of the reports. The State responded that if the post-conviction court believed that "[Petitioner] has reached that basic threshold [of showing likelihood of success at trial], the State would stipulate rather than paying the cost of bringing Ms. Loehrs here, the State will stipulate and we can introduce the expert opinion reports to the Court." At the conclusion of the post-conviction hearing, the post-conviction court stated that it would "take the matter under advisement and give an opinion[.]" The post-conviction court also stated that depending on what findings it made under *Strickland v. Washington*, 466 U.S. 668 (1984), it would "then determine whether [the post-conviction court and parties] need[ed] to pursue the issue with the experts."

- 6 -

On March 24, 2016, the post-conviction court entered an order denying post-conviction relief. The court stated:

> The expert of . . . Petitioner resided in Arizona, and counsel for . . . Petitioner did not advance or request of [Petitioner] that he front or pre-pay the expense of transportation and testimony time for his expert, in consideration of the fact that Petitioner's expert would be of little benefit.

> On the day of trial, August 18, 2014, Petitioner agreed to enter a Best Interest plea, at which time the trial [j]udge specifically inquired, "Do you understand by entering this no contest plea, that you are forever giving up your right to have that jury trial?" The response of . . . Petitioner was, "Yes sir." The trial [j]udge continued with further questioning and very thoroughly covered with . . . Petitioner . . . Petitioner's right, and the fact that a conviction would be entered.

The post-conviction court concluded that "[i]n reviewing the transcript of the plea [submission hearing] . . . , this court considered the factors enumerated in *Blankenship* and finds that the [Petitioner] entered the [b]est [i]nterest plea voluntarily, understandingly, and knowingly."

*Appellate proceedings*

Petitioner filed a timely notice of appeal to this court. After reading the parties' briefs and observing oral arguments, this court reversed and remanded the case to the post-conviction court for a new post-conviction hearing. *See Henry Epps v. State*, No. M2016-00626-CCA-R3-PC, 2017 WL 1830097, at *1 (Tenn. Crim. App. May 4, 2017), *pet. to rehear denied* (Tenn. Crim. App. May 22, 2017), *no perm. app. filed.*

This court concluded that the post-conviction court failed to enter a final order that contained specific findings of fact and conclusions of law relevant to each of Petitioner's issues. *Id.* at *8. "Because there was minimal evidence in the record regarding the substance of the reports of the State's expert and Ms. Loehrs," this court "encourage[d] the parties to stipulate to the admission of the reports in the interests of judicial efficiency or for the trial court to accommodate her testimony telephonically." *Id.*

*Proceedings on remand*

On remand, Petitioner filed an affidavit from Ms. Loehrs. The State filed several reports and an affidavit from its forensic expert, Scott Levasseur. This opinion will

summarize the relevant reports and the affidavits in chronological order based on the date the document was created.

The State filed a report prepared by Investigator Levasseur on June 22, 2011. The report stated that Investigator Levasseur examined LT1 and LT2, two Dell laptop computers, and ED4, an external hard drive in his investigation of Petitioner's case. The report noted that additional devices, ED1, ED2, ED3, and ED5, were addressed in a separate report. In the report, Investigator Levasseur stated that, on LT1, the child pornography files existed on the user profile named "Airborne[.]" He found 217 child pornography videos and twenty-six child pornography images in the "Airborne" user's directories. Investigator Levasseur found thousands of images that could have been child pornography, but he did not include these files in the report because he was unable to verify whether the images depicted a minor. Investigator Levasseur noted that the "Airborne" user used the LimeWire application to download most of the files of child pornography. "Airborne" used search terms such as "PTHC," "PEDO," and "INCEST" to find the files of child pornography in the LimeWire application.

Regarding LT2, Investigator Levasseur stated that the files of child pornography were downloaded by a user profile named "big popa[.]" Investigator Levasseur found 159 files of child pornography images on this computer. He noted that "[t]hese files [we]re mostly thumbnails of files that ha[d] been removed or deleted[.]" LimeWire was also installed on LT2, and the "big popa" user searched for terms such as "PTHC" and "PEDO" to find the files of child pornography in the LimeWire application. Investigator Levasseur found that "[a]ll the videos files that were downloaded to this computer ha[d] been moved off or ha[d] been deleted from this hard drive[;] evidence of their existence remain[ed] in the form of thumbnails and file naming data."

Investigator Levasseur found 294 files of child pornography videos on ED4. Additionally, he found "hundreds of child pornography images" that were "thumbnail representations" of videos of child pornography. Investigator Levasseur found that the child pornography files on ED4 were created from 2008 to 2010. He concluded that "[t]he evidence on the drives indicate[d] that [Petitioner] appear[ed] to be the primary user and owner" of LT1, LT2, and ED4.

In a supplemental report dated July 22, 2011, Investigator Levasseur discussed his examination of ED1, ED2, ED3, and ED5. ED1 contained "more than 1000 . . . images of pre-teen and teenage girls"; "[t]hese images appear[ed] to have come from social networking sites, most of the images are of clothed teen females." ED2 contained "more than 5800 images and movies of preteen and teenage females." The report stated that many of the images on ED2 could be considered child pornography. ED3 contained one file of a child pornography video. ED5 contained more than 800 images of "young pre-

teen and teenage girls" that had been deleted; the report stated that the minor females depicted in these images were "mostly clothed."

In a supplemental report dated January 17, 2013, Investigator Levasseur stated that he reexamined LT1 and LT2 after learning that Petitioner was deployed from February 12, 2010, to February 17, 2011. He also learned that Petitioner's son did not have access to the devices from September 2010 to April 2010. Investigator Levasseur found no evidence that Petitioner accessed LT2 from February 18, 2010, through July 1, 2010. Additionally, he found no evidence that child pornography files were accessed or downloaded during that period. Investigator Levasseur observed that the files of child pornography videos on LT2 were downloaded from 2006 to 2010. Additionally, LimeWire was last used on LT2 on February 11, 2010.

Investigator Levasseur concluded that Petitioner downloaded the child pornography files on LT2 because on June 14, 2009, a user accessed a child pornography video a few minutes after the user saved and viewed a PDF document that belonged to Petitioner and related to his government Thrift Savings Plan. Additionally, on October 28, 2009, a user logged into Petitioner's YouTube account, downloaded child pornography through LimeWire, and then logged into Petitioner's YouTube account again. Investigator Levasseur found several other examples of a user accessing child pornography around the time the user accessed data or documents related to Petitioner.

Regarding LT1, Investigator Levasseur found that on February 2, 2010, a user account named "Airborne" was created. This user account was associated with a password of "airborne1998"; Investigator Levasseur stated that this password was used on other internet accounts associated with Petitioner. Investigator Levasseur identified the Globally Unique Identifier ("GUID") for the copy of LimeWire installed on LT1. The GUID for LT1 used the internet to download child pornography in Clarksville from July 5 to 17, 2010, and also connected to the internet in a Middle Eastern country from November 1, 2010 to January 2011 to again download child pornography. Investigator Levasseur identified numerous dates when the user of LT1 accessed or downloaded files of child pornography and also accessed Petitioner's YouTube, Facebook, Yahoo mail, and Bank of America accounts. Investigator Levasseur also stated in the report that Petitioner admitted to using the BitTorrent program to download pornography to LT1 and that the last occasion he did so was April 7, 2010. Investigator Levasseur found that on April 7, the user of LT1 downloaded "many" files of child pornography.

Investigator Levasseur gave the following conclusions about his analysis of LT1:

> It . . . appears that this laptop was in Clarksville after [Petitioner] left on deployment in February 2010. There is evidence that [Petitioner's wife]

- 9 -

used this computer while he was gone. (No pornography or any files or accounts belonging to [Petitioner] were accessed during this time)

Then on July 2nd[,] 2010, US Army online accounts belonging to [Petitioner] were accessed using his user names and passwords (these accounts are restricted by the Government to [Petitioner] exclusively). Then Lime[W]ire was installed and child pornography began to be downloaded. Torrents were also accessed. Videos from You[T]ube . . . were transferred from ED4 to this computer. On July 18th[,] this computer connected to the Atlanta Airport WiFi, then to wireless networks named as military type SSID's. Following the connection to Atlanta Airport, this computer never connected to . . .[Petitioner's] family router again until late February 2011. Between July 18[,] 2010[,] and late February 2011[,] [f]iles were created by [Petitioner], online accounts belonging to [Petitioner] were accessed and child pornography files were downloaded and viewed. From February 19[,] 2011[,] to April 8[,] 2011[,] numerous child pornography files were downloaded and accessed. [Investigator Levasseur] again was able to find accounts and activities associated with [Petitioner] occurring around the same time as access to these child pornography files. [Investigator Levasseur] found no evidence o[f] any other user accessing this computer in close proximity to the child pornography files.

In an additional supplemental report dated July 30, 2013, Investigator Levasseur stated that he examined the devices for malware. He found possible malware threats on LT1, but he found "no evidence that any of them [we]re related to child pornography except for the fact that nine of them were downloaded from the LimeWire application while it was downloading child pornography on 11/10/2010." When Investigator Levasseur tested the malware, the programs did not access or download pornography. Regarding LT2, he found numerous malware files that the computer's anti-virus program had quarantined; two remaining malware files were downloaded after the child pornography was downloaded to the computer.

In Ms. Loehrs' report,[2] dated August 31, 2013, she stated that she examined LT1. She found that "the user account Airborne was not password protected." She noted that Investigator Levasseur found files of child pornography in three different areas of LT1: the "Unallocated Space" folder, the "Pix" folder of the user "Airborne," and the "Shared" folder of the user "Airborne." Ms. Loehrs did not find any files of child pornography in the "Unallocated Space" folder due to "the limitations of an offsite examination[.]"

---

[2] Some of Ms. Loehrs' report had been redacted. This opinion only summarizes the unredacted portions.

Additionally, she noted that it was impossible to determine the origin and creator of images in unallocated space on a computer. Regarding the "Pix" folder, Ms. Loehrs found 2,406 images that were created on January 24, 2011. She was unable to determine whether any of these images were child pornography. Regarding the "Shared" folder, Ms. Loehrs stated that the LimeWire application had been installed on LT1 on July 2, 2010, and that the "Shared" folder was the default location for files downloaded through the LimeWire application. Ms. Loehrs' report listed numerous files downloaded through LimeWire that contained keywords associated with child pornography in the title or description.

She also noted that the "Airborne" user's Pictures directory contained images from Petitioner's deployment as well as "[Petitioner] returning home to his family." The photographs were taken from March 6, 2010, to June 18, 2010. Ms. Loehrs also found photographs taken during Petitioner's second deployment from August 1, 2010, to November 15, 2010. When Ms. Loehrs examined LT2, she found one user account named "big popa." She noted that the 159 files of child pornography that Investigator Levasseur found on LT2 were all "Thumb" files.[3] Ms. Loehrs stated that she could not make any conclusions regarding the video files found on ED4 because of "the time constraints of a limited two day examination[.]"

In an affidavit dated on December 28, 2017, Ms. Loehrs stated that she was a licensed private investigator and certified forensic examiner. Ms. Loehrs stated in the affidavit that Petitioner retained her to perform a forensic examination in his criminal case. Ms. Loehrs stated that trial counsel did not ask her to appear at trial, did not subpoena her to testify at trial, did not disclose her to the State as an expert witness, and did not inform Petitioner that she would not be testifying at trial.

Ms. Loehrs examined two laptop computers and one external USB hard drive. She concluded that "only two files indicative of child pornography were opened and viewed on [LT1]." Further, she concluded that the two files were deleted after they were viewed. She found that Petitioner took LT1 on his deployment and found evidence that several other users accessed the computer during this time. Regarding LT2, Ms. Loehrs found that the 159 images of child pornography found by the State's expert "were forensically recovered from thumbnail images stored by the Windows operating system." Ms. Loehrs explained that "[i]mages in the thumbnail databases cannot be opened without the use of specialized tools, and such images will remain in the databases unbeknownst to the user when an image or video is deleted from the computer." Regarding her analysis of the external hard drive, Ms. Loehrs stated that the metadata of

_____

[3] Ms. Loehrs explained that Thumb files were "hidden file[s] created by the Windows operating system that store[d] small thumbnails of images that [we]re on the computer."

- 11 -

the files found on the external hard drive "may not accurately represent when said files were downloaded or created on a computer."

Based on photographs found on LT1, Ms. Loehrs determined that Petitioner was deployed in Afghanistan from March 6, 2010, to June 18, 2010. She determined that Petitioner returned to the United States for at least two weeks in July 2010. During this period, Defendant went on vacation with his family. On July 2, 2010, a user of LT1 installed LimeWire, a file sharing program. Ms. Loehrs stated that the shared files folder from LimeWire "showed that files appearing to be child pornography were created in that folder from July 2, 2010, to July 18, 2010." She noted that the State's expert asserted that the time data of the photographs taken during Defendant's family vacation was inaccurate. Ms. Loehrs found that a user downloaded additional files of child pornography on LT1 from November 10, 2010, to April 2011. Ms. Loehrs stated that "evidence found on LT1 indicated that the computer had multiple users during that time period." She concluded that "additional, non-forensic evidence of [Petitioner's] lack of access to LT1 during the times that files depicting child pornography were downloaded to LT1 would tend to aid in [Petitioner's] defense."

Ms. Loehrs additionally performed a second examination of the devices. She stated that "[t]he forensic evidence from this examination was not helpful to the defense[.]" However, she stated that the evidence "did not change [her] opinion that [Petitioner] had a factual defense to the charges if he were able to show that he was not at the keyboard of LT1 when files depicting child pornography were downloaded." Ms. Loehrs noted that trial counsel asked her not to produce a report of the findings of the second examination and informed her that she would not be testifying at trial. Ms. Loehrs opined that, regardless of the strength of the State's evidence, Petitioner had a factual defense.

Investigator Levasseur swore to an affidavit on February 14, 2018. In his affidavit, Investigator Levasseur stated that Marlene Pulido examined the devices at issue in this case in his lab on August 8, 2013. Later, he received a report from Ms. Loehrs; he asserted that this report "was factually inaccurate on key facts" and that "the report's conclusions were flawed and incorrect." Investigator Levasseur prepared supplemental reports and PowerPoint presentations in response to Ms. Loehrs' report. On May 29, 2014, Ms. Loehrs examined the relevant devices at Investigator Levasseur's lab.

Investigator Levasseur asserted that Ms. Loehrs' affidavit contained "inaccurate, misleading or downright false statements[.]" More specifically, Investigator Levasseur disagreed with Ms. Loehrs' statements that: (1) the only files of child pornography that had been opened and viewed had been deleted; (2) there was evidence of several other users of LT1 that could have downloaded the child pornography files; (3) LT1 was not

- 12 -

password protected; (4) the time stamp of the photographs of the family vacation established that Petitioner did not have access to LT1 during one of the occasions when child pornography files were downloaded on the computer; and (5) there was evidence of other users of LT1 while Petitioner was deployed.

On May 14, 2018, the post-conviction court entered an order denying post-conviction relief. The court found that "each of the parties obtained experts to examine the computers and external hard drives of . . . Petitioner for the purpose establishing whether Petitioner knowingly possessed images depicting minors engaged in sexual activity or simulated sexual activity." Additionally, the post-conviction court found that, while Ms. Loehrs' initial report "indicated that on the computer identified as LT1 there was some question as to the identity of the person or persons who downloaded the images, . . . this opinion was seriously impeached if not rendered ineffective by the subsequent examination by the State's expert." The post-conviction court noted that LT1 "reflected email use attributable to . . . Petitioner and access to bank accounts of . . . Petitioner which were password protected during the dates and times of downloads." The court found that trial counsel, "when considering the evidence available for presentation at trial[,] advised Petitioner as to his options in a somewhat direct manner when advising him that he could accept the State's offer, proceed to trial with no defense or go to Mexico." The court noted that "[a]n attorney cannot create evidence but can only develop strategy to present evidence available in a way most beneficial to the client."

Regarding Petitioner's claim of ineffective assistance of counsel, the post-conviction court concluded that "Petitioner failed to establish that his expert witness could offer sufficient favorable and material testimony." The court also concluded "that in consideration of the expert opinions available to counsel[,] . . . the options explained to Petitioner were within the standard of reasonableness under prevailing professional norms[.]" Regarding Petitioner's claim that he unknowingly and involuntarily entered a plea of no contest, the post-conviction court found that "[t]he transcript of the plea in this case reflects that the trial judge reviewed in detail the rights of . . . Petitioner and that Petitioner indicated that he understood same." The court concluded that "Petitioner's best interest plea was entered in accordance with *Hicks v. State*, 983 S.W.2d 240 (Tenn. 1998), and that such plea was entered knowingly and voluntarily."

Petitioner now timely appeals the post-conviction court's denial of relief.

## II. Analysis

### *Standard of Review*

In order to prevail on a petition for post-conviction relief, a petitioner must prove all factual allegations by clear and convincing evidence. *Jaco v. State*, 120 S.W.3d 828, 830 (Tenn. 2003). Post-conviction relief cases often present mixed questions of law and fact. *See Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). Appellate courts are bound by the post-conviction court's factual findings unless the evidence preponderates against such findings. *Kendrick v. State*, 454 S.W.3d 450, 457 (Tenn. 2015). When reviewing the post-conviction court's factual findings, this court does not reweigh the evidence or substitute its own inferences for those drawn by the post-conviction court. *Id.*; *Fields*, 40 S.W.3d at 456 (citing *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997)). Additionally, "questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the [post-conviction court]." *Fields*, 40 S.W.3d at 456 (citing *Henley*, 960 S.W.2d at 579); *see also Kendrick*, 454 S.W.3d at 457. The post-conviction court's conclusions of law and application of the law to factual findings are reviewed *de novo* with no presumption of correctness. *Kendrick*, 454 S.W.3d at 457.

### *Ineffective Assistance of Counsel*

On appeal, Petitioner alleges that trial counsel's performance was deficient because he "failed to consult with or inform [Petitioner] as to whether [Petitioner]'s expert would be used at trial" and "unilaterally discarded [Petitioner]'s defense, allowing him no say as to whether the case would proceed to a trial that would have presumably consisted of a jury hearing testimony from each side's competing experts." Petitioner asserts that because of trial counsel's deficient performance, he was essentially denied the right to proceed to trial because he no longer had a defense. Additionally, he contends that "but for trial counsel's failure to file notice of [Petitioner]'s expert witness and subpoena that witness for trial, [Petitioner] would have insisted on going to trial."

The State responds that Petitioner cannot establish that trial counsel was deficient by failing to call Ms. Loehrs as an expert at trial because Ms. Loehrs' affidavit "provides only that [Petitioner] could have a 'factual defense' to the charges 'if he were able to show that he was not at the keyboard of LT1 when files depicting child pornography were downloaded.'" The State asserts that Petitioner failed to present evidence at the post-conviction hearing that he was not using the laptops when child pornography was downloaded. Thus, the State contends that trial counsel made a reasonable strategic decision not to call Ms. Loehrs. Additionally, the State argues that trial counsel testified

- 14 -

that he informed Petitioner that Ms. Loehrs would not testify at trial after she reported that she could not rebut the State's expert's report.

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. In order to receive post-conviction relief for ineffective assistance of counsel, a petitioner must prove: (1) that counsel's performance was deficient; and (2) that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (stating that the same standard for ineffective assistance of counsel applies in both federal and Tennessee cases). Both factors must be proven in order for the court to grant post-conviction relief. *Strickland*, 466 U.S. at 687; *Henley*, 960 S.W.2d at 580; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Accordingly, if we determine that either factor is not satisfied, there is no need to consider the other factor. *Finch v. State*, 226 S.W.3d 307, 316 (Tenn. 2007) (citing *Carpenter v. State*, 126 S.W.3d 879, 886 (Tenn. 2004)). Additionally, review of counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689; *see also Henley*, 960 S.W.2d at 579. We will not second-guess a reasonable trial strategy, and we will not grant relief based on a sound, yet ultimately unsuccessful, tactical decision. *Granderson v. State*, 197 S.W.3d 782, 790 (Tenn. Crim. App. 2006).

As to the first prong of the *Strickland* analysis, "counsel's performance is effective if the advice given or the services rendered are within the range of competence demanded of attorneys in criminal cases." *Henley*, 960 S.W.2d at 579 (citing *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)); *see also Goad*, 938 S.W.2d at 369. In order to prove that counsel was deficient, the petitioner must demonstrate "that counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688); *see also Baxter*, 523 S.W.2d at 936.

Even if counsel's performance is deficient, the deficiency must have resulted in prejudice to the defense. *Goad*, 938 S.W.2d at 370. Therefore, under the second prong of the *Strickland* analysis, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. (quoting *Strickland*, 466 U.S. at 694) (internal quotation marks omitted).

A substantially similar two-prong standard applies when the petitioner challenges counsel's performance in the context of a guilty plea. *Hill v. Lockhart*, 474 U.S. 52, 58

(1985); *Don Allen Rodgers v. State*, No. W2011-00632-CCA-R3-PC, 2012 WL 1478764, at *4 (Tenn. Ct. Crim. App. April 26, 2012). First, the petitioner must show that his counsel's performance fell below the objective standards of reasonableness and professional norms. *See Hill*, 474 U.S. at 58. Second, "in order to satisfy the 'prejudice' requirement, the [petitioner] must show that there is a reasonable probability that, but for counsel's errors, he would have not have pleaded guilty and would have insisted on going to trial." *Id.* at 59.

The post-conviction court found that, while Ms. Loehrs' initial report "indicated that on the computer identified as LT1 there was some question as to the identity of the person or persons who downloaded the images, . . . this opinion was seriously impeached if not rendered ineffective by the subsequent examination by the State's expert." The court noted that "[a]n attorney cannot create evidence but can only develop strategy to present evidence available in a way most beneficial to the client." The post-conviction court concluded that "Petitioner failed to establish that his expert witness could offer sufficient favorable and material testimony." The court also concluded "that in consideration of the expert opinions available to counsel[,] . . . the options explained to Petitioner were within the standard of reasonableness under prevailing professional norms[.]"

We determine that the post-conviction court did not err in determining that trial counsel was not deficient in failing to subpoena Ms. Loehrs to testify at trial. By finding no deficient performance, the post-conviction court impliedly credited trial counsel's testimony that he probably informed Petitioner that Ms. Loehrs would not testify at trial "right after" Ms. Loehrs informed trial counsel that she could not rebut the State's second report. When asked when he notified Petitioner that his expert had not been subpoenaed or indicated as a witness on the witness list, trial counsel stated "[p]robably right after [Ms. Loehrs] told [him] on the phone that she could not dispute the State's follow-up report." This court has previously stated that "the fact that a particular strategy or tactic failed or even hurt the defense does not, alone, support a claim of ineffective assistance. Deference is made for sound trial strategy. However, this deference to tactical choices only applies if the choices are informed ones based upon adequate preparation." *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992) (citing *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982)); *see also House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001). Trial counsel made the strategic decision not to call Ms. Loehrs to testify after both Ms. Loehrs and Investigator Levasseur conducted multiple examinations and submitted multiple reports. As the post-conviction court noted, trial counsel could not have invented a defense based on false facts in order to present a more favorable defense to Petitioner. The post-conviction court did not err by concluding that trial counsel adequately represented Petitioner by deciding against calling Ms. Loehrs to testify at trial.

Additionally, we agree with the post-conviction court that Petitioner did not establish that he was prejudiced by trial counsel's decision not to call Ms. Loehrs. Petitioner asserts that Ms. Loehrs' report and testimony would have been beneficial to his defense if he had proceeded to trial because he could have presented evidence that he did not have access to the computers at the time the child pornography files were downloaded and could have argued that someone else downloaded the files. However, Petitioner did not present any evidence at the post-conviction hearing to establish that he did not have access to LT1 or LT2 at the time that a user downloaded or viewed child pornography on the computers. Thus, Petitioner cannot establish that he was prejudiced by trial counsel's decision not to subpoena Ms. Loehrs for trial. See *Black v. State*, 794 S.W.2d 752, 757-58 (Tenn. Crim. App. 1990). Further, when we consider that Ms. Loehrs could not rebut the State's report, the post-conviction court credited Investigator Levasseur's reports, and the fact that Petitioner received an eight year sentence in comparison to the sentence of seventy-two years that he faced it trial, we think it unlikely that Petitioner would have proceeded to trial. Petitioner is not entitled to relief on this ground.

*Unknowing and involuntary guilty plea*

Petitioner also contends that the post-conviction court "erred in concluding that the transcript of the best interest plea at trial, in which [Petitioner] indicated his understanding of his rights, was sufficiently knowing and voluntary such that the *Blankenship* standard was satisfied." Petitioner argues that he "did not have a meaningful opportunity to confer with trial counsel about alternatives[,]" that "trial counsel . . . unilaterally deprived [Petitioner] of the option to choose trial[,]" and that Petitioner "had no prior experience with criminal proceedings, which would have weighed in favor of a finding that [Petitioner]'s plea was not voluntary, intelligent, or knowing." The State responds that Petitioner understood "the terms of the plea agreement, . . . the charges he faced and his trial rights, that . . . he faced a significantly longer sentence if convicted at trial, and that he entered his no contest plea because he decided doing so was in his best interest."

Whether a guilty plea is intelligent and voluntary is a mixed question of law and fact. *Jaco*, 120 S.W.3d at 830-31. Therefore, in such cases we review the post-conviction court's findings of fact *de novo* with a presumption of correctness. *Id.* The post-conviction court's findings of law are reviewed purely *de novo*. *Id.*

When reviewing a guilty plea, this court looks to both the federal standard as announced in the landmark case *Boykin v. Alabama*, 395 U.S. 238 (1969), and the state standard as announced in *State v. Mackey*, 553 S.W.2d 337 (Tenn. 1977), *superseded on other grounds by* Tenn. R. Crim. P. 37(b) and Tenn. R. App. P. 3(b). *Don Allen Rodgers v. State*, No. W2011-00632-CCA-R3-PC, 2012 WL 1478764, at *5 (Tenn. Crim. App.

Apr. 26, 2012). Under the federal standard, there must be an affirmative showing that the plea was "intelligent and voluntary." *Boykin*, 395 U.S. at 242. Likewise, the Tennessee Supreme Court has held that "the record of acceptance of a defendant's plea of guilty must affirmatively demonstrate that his decision was both voluntary and knowledgeable, i.e., that he has been made aware of the significant consequences of such a plea . . . ." *Mackey*, 553 S.W.2d at 340. "[A] plea is not 'voluntary' if it is the product of '[i]gnorance, incomprehension, coercion, terror, inducements, [or] subtle or blatant threats . . . ." *Blankenship v. State*, 858 S.W.2d 897, 904 (Tenn. 1993) (quoting *Boykin*, 395 U.S. at 242-43).

In order to determine whether a plea is intelligent and voluntary, the trial court must "canvass[] the matter with the accused to make sure he has a full understanding of what the plea connotes and of its consequence." *Boykin*, 395 U.S. at 244. The trial court looks to several factors before accepting a plea, including:

> [T]he relative intelligence of the defendant; degree of his familiarity with criminal proceedings; whether he was represented by competent counsel and had the opportunity to confer with counsel about the options available to him; the extent of advice from counsel and the court concerning the charges against him; and the reasons for his decision to plead guilty, including a desire to avoid a greater penalty that might result from a jury trial.

*Blankenship*, 858 S.W.2d at 904; *Howell v. State*, 185 S.W.3d 319, 330-31 (Tenn. 2006). Once the trial court has conducted a proper plea colloquy, it discharges its duty to assess the voluntary and intelligent nature of the plea and creates an adequate record for any subsequent review. *Boykin*, 395 U.S. at 244.

Statements made by a petitioner, his attorney, and the prosecutor during the plea colloquy, as well as any findings made by the trial court in accepting the plea, "constitute a formidable barrier in any subsequent collateral proceedings." *Blackledge v. Allison*, 431 U.S. 63, 73-74 (1977). Statements made in open court carry a strong presumption of truth, and to overcome such presumption, a petitioner must present more than "conculsory allegations unsupported by specifics." *Id.* at 74.

The post-conviction court found that "[t]he transcript of the plea in this case reflects that the trial judge reviewed in detail the rights of . . . Petitioner and that Petitioner indicated that he understood same." The court concluded that "Petitioner's best interest plea was entered in accordance with *Hicks v. State*, 983 S.W.2d 240 (Tenn. 1998), and that such plea was entered knowingly and voluntarily."

We conclude that the post-conviction court did not err in denying relief on this ground. Although Petitioner testified that he felt as if he had no other choice but to enter a best interest plea because his expert had not been subpoenaed to testify, his request for a continuance had been denied, and his "attorney wasn't going to fight on [his] behalf[,]" Petitioner also agreed that if he had proceeded to trial, he would have faced a possible sentence of over seventy-two years. Trial counsel noted that Petitioner originally declined a plea offer of eleven years and agreed to enter a best interest plea in exchange for a sentence of eight years. Additionally, at the guilty plea submission hearing, Petitioner stated that he understood that he was waiving his rights by entering his best interest plea. Petitioner also affirmed that it was his desire to enter the best interest plea. Petitioner has not overcome the presumption of truth assigned to this testimony and is not entitled to relief on this ground.

### III. Conclusion

For the aforementioned reasons, the judgment of the post-conviction court is affirmed.

_____
ROBERT L. HOLLOWAY, JR., JUDGE